**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-5063

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
MICHAEL C. JOHNSTON, in his official capacity as Mayor of Denver, Colorado,
MICHIKO ANDO BROWN, in her official capacity as City Attorney for the City and County of Denver, Colorado, and
RONALD THOMAS, in his official capacity as Chief of Police of the City and County of Denver, Colorado,

Defendants.

---

# COMPLAINT

---

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. The Supremacy Clause of the United States Constitution prohibits state and local governments from regulating the activities of the Federal Government. *United States v. Washington*, 596 U.S. 832, 838–39 (2022). Despite this well-established principle, Defendant City and County of Denver, Colorado has amended its municipal code to regulate the manner in which federal officials perform their official duties in Denver.

2. Specifically, on March 3, 2026, Defendant Mayor Michael C. Johnston signed and approved Denver, Colo., City Council Bill No. 26-0125, Ordinance No. 125-26 (the "Ordinance")

(attached hereto as Ex. A). The Ordinance bans facial coverings for federal law enforcement officers and requires them to display or provide identification while on duty. *See* D.R.M.C. §§ 28-300–28-303. The Ordinance also mandates that federal law enforcement officers who are "not uniformed" identify themselves upon request. *Id.* § 28-303(b).

3. Federal law enforcement officers face criminal penalties, including jail time and fines, for violating the Ordinance. *See* D.R.M.C. § 1-13(a)–(b).

4. Courts across the United States have consistently held that laws functionally identical to the Ordinance constitute unconstitutional direct regulation of the Federal Government and have repeatedly enjoined them. *See, e.g., United States v. California,* 173 F.4th 1060, 1063 (9th Cir. 2026) (unanimously granting an injunction pending appeal in a case involving a functionally identical California law requiring federal law enforcement officers to "visibly display identification"); *United States v. New York,* No. 1:26-cv-1360, 2026 WL 2225423, at *16 (N.D. N.Y. Aug. 3, 2026); *United States v. Virginia*, No. 3:26-cv-0545, 2026 WL 2411521, at *15 (E.D. Va. Aug. 18, 2026), *appeal docketed*, No. 26-2248 (4th Cir. Sep. 14, 2026); *United States v. City of Philadelphia*, No. 2:26-cv-4208, 2026 WL 1906075, at *14 (E.D. Pa. July 2, 2026).

5. This Court should join the growing number of courts putting an end to this unconstitutional regulation of the Federal Government by invalidating and enjoining the Ordinance.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

7. Venue is proper in the United States District Court for the District of Colorado under 28 U.S.C. § 1391(b) because all Defendants reside in this district and a substantial part of the events giving rise to this action occurred in this district.

8. The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

9. Plaintiff, the United States of America, enforces federal laws through its Executive agencies. Those agencies include but are not limited to the Department of Justice ("DOJ") and its component law enforcement agencies—*e.g.*, the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA")—and the Department of Homeland Security ("DHS") and its component law enforcement agencies—*e.g.*, U.S. Immigration and Customs Enforcement ("ICE"), which includes Homeland Security Investigations ("HSI"), and U.S. Customs and Border Protection ("CBP").

10. Defendant City and County of Denver is a consolidated municipality and political and geographic subdivision within the State of Colorado.

11. Defendant Michael C. Johnston is the Mayor of the City and County of Denver and is sued in his official capacity as "the chief executive" of the City and County of Denver, D.R.M.C. Title 1(b) §§ 2.2.1, 2.2.2, who "possess[es], ha[s] and exercise[s], all the executive and administrative powers granted to the City and County of Denver," *id.* § 2.2.1, and is charged with

"enforc[ing] all laws and ordinances" and "remit[ting] fines and penalties imposed for the violation of any ordinance," *id.* § 2.2.2. Mayor Johnston appoints and has control of the City Attorney and Chief of Police of the City and County of Denver. *See id.* § 2.2.6(A). Mayor Johnston is empowered to enforce the Ordinance.

12. Defendant Michiko Ando Brown is the City Attorney of the City and County of Denver and is sued in her official capacity as "the officer in full charge and control of the Department of Law," D.R.M.C. Title 1(b) § 6.1.1, which is tasked with "[a]ppearing in behalf of the people of the City and County of Denver in all actions and proceedings involving the alleged violation of any Charter provision, ordinance or rule and regulation of the City and County of Denver." *Id.* § 6.1.3(F). Attorney Brown is empowered to enforce the Ordinance.

13. Defendant Ronald Thomas is the Chief of Police of the City and County of Denver and is sued in his official capacity as the head of the Denver Police Department, which is tasked with "apprehend[ing] any and all persons in the act of committing any offense against the laws of the State or of the ordinances," and "at all times diligently and faithfully enforc[ing] all such laws, ordinances and regulations . . . as the Council may enact, and upon due and reasonable suspicion arrest[ing] any person or persons who may be guilty of a breach of any of the ordinances" D.R.M.C. Title 1(b) § 2.6.5(B). Chief Thomas is empowered to enforce the Ordinance.

**FEDERAL SUPREMACY AND LAW ENFORCEMENT**

14. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause incorporates principles of intergovernmental immunity, and thus, a state enactment is invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (citation omitted).

15. The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. Subordinate officers in various federal agencies, including DOJ and DHS, and their components, assist the President in discharging that duty. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020); *see also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (stating that the Federal Government "can act only through its officers and agents").

16. Federal law empowers the Executive to provide for and dictate the conduct of federal law enforcement officers in carrying out their official duties. *See, e.g.,* 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the DOJ in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of DHS the power to "control, direct[], and supervis[e]" all DHS employees).

17. Federal law similarly empowers the Executive to provide for and direct federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g., id.*; 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees); 10 U.S.C. § 723(b)(1) (providing exception to certain identification requirements to individuals who "do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties").

18. Because the Federal Government's authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers and agents "must act within the States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement officers carry out their duties within the states and their localities, including in Denver, Colorado.

19. For example, the DEA enforces our Nation's controlled substances laws. *See generally* The Controlled Substances Act, *codified as amended at* 21 U.S.C. §§ 801, *et seq.* In carrying out that mission, the DEA investigates and aids in the prosecution of major violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100–0.101.[1]

[1] *See also* DEA, *Mission Statement*, https://www.dea.gov/about/mission (last visited Sep. 21, 2026).

20. As another example, the FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. It carries out this mission through numerous operations throughout the country and in partnership with federal, state, local, and foreign officials. *See id.* § 0.85.[2]

21. DHS, through ICE and CBP, is responsible for enforcing our Nation's immigration laws, including the Immigration and Nationality Act of 1952 (as amended), Pub. L. 82-414, ch. 477, 66 Stat. 163 (codified at 8 U.S.C. § 1101, *et seq.* ("INA"), which, pursuant to Congress's power to "establish an uniform Rule of Naturalization," U.S. Const. art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *see Arizona v. United States*, 567 U.S. 387, 395 (2012).

22. The INA confers upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully present in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231, 1357. As part of those enforcement efforts, DHS, through HSI, also investigates transnational crimes and threats, including incidents of human smuggling and human trafficking. *See* 8 U.S.C. §§ 1232, 1324.

[2] *See also* FBI, *About, Mission and Priorities*, https://www.fbi.gov/about/mission (last visited Sep. 21, 2026).

## THE DENVER ORDINANCE

23. On or about November 15, 2024, Denver Mayor Michael C. Johnston signaled his intention to prevent the incoming Trump Administration from enforcing its immigration policies in Denver, stating, "More than us having [Denver Police Department] stationed at the county line to keep them out, you would have 50,000 Denverites there[.] It's like the Tiananmen Square moment with the rose and the gun, right? You'd have every one of those Highland moms who came out for the migrants. And you do not want to mess with them."[3]

24. On January 12, 2026, during the Denver City Council Budget and Policy Committee's bi-weekly meeting, Councilwomen Alvidrez and Lewis delivered a "Presentation on Law Enforcement Masking Policy" and proposed draft legislation to impose masking and identification requirements on federal law enforcement officers.[4] As Councilwoman Lewis explained, "The problem that we are trying to solve is that federal law enforcement agents are wearing masks to conceal their identities."[5] The presentation materials identified "federal law enforcement officers" as "the problem," and included a photograph of a masked person wearing an ICE badge and a DHS-marked uniform.[6] The presentation made clear that the Ordinance was

---

[3] *See* https://denverite.com/2024/11/25/denver-mayor-mike-johnston-donald-trump-immigration-law/ (last visited Oct. 7, 2026).

[4] Denver City Council, Jan. 12, 2026, Budget and Policy Committee Meeting Details, https://denver.legistar.com/MeetingDetail.aspx?ID=1375127&GUID=E3C348D1-71D9-40EE-A451-36B61E067990&Options=&Search= (last visited Sep. 21, 2026).

[5] Denver City Council, Jan. 12, 2026, Budget and Policy Committee Meeting Video Recording, https://denver.granicus.com/player/clip/19900 (last visited Sep. 21, 2026) at 05:53.

[6] Denver City Council, Federal Law Enforcement Masking Policy Presentation, https://denver.legistar.com/View.ashx?M=F&ID=15059633&GUID=AC2B3A8B-67FE-43A5-AB96-089A60A6D799 (last visited Sep. 21, 2026).

designed to prohibit federal law enforcement officials from wearing facial coverings and to mandate that they display identification in a manner deemed sufficient by local Denver officials.

25. A few weeks later, Mayor Johnston publicly expressed his desire to reform ICE, stating, "ICE isn't keeping us safe from the bad guys[.] Right now, they are the bad guys — and the longer they remain on our streets without immediate reforms the more people are in danger."[7]

26. On March 2, 2026, the Denver City Council passed the Ordinance.[8]

27. During the meeting, members of the Denver City Council made clear that the Ordinance was intended to regulate federal law enforcement officers. For example, Councilwoman Lewis, a cosponsor of the Ordinance, commented that the Ordinance was necessary to protect communities from "federal law enforcement"[9] and that it was being passed in preparation for "when ICE gets here."[10] Councilwoman Alvidrez, the other cosponsor of the Ordinance, commented that the Ordinance was intended to help people distinguish masked "federal agents" from other masked individuals.[11]

28. Although supporting the Ordinance, Councilwoman Torres admitted that "immigration policy" was a "federal issue."[12]

---

[7] *See* https://denverite.com/2026/01/28/denver-mayor-ice-amicus-brief/ (last visited Sep. 29, 2026).

[8] Denver City Council, Mar. 2, 2026, City Council Meeting Details, https://denver.legistar.com/MeetingDetail.aspx?ID=1397535&GUID=DE27ADAA-1222-4DFA-8347-EBFA4CCE3CDA&Options=&Search= (last visited Sep. 21, 2026).

[9] Denver City Council, Mar. 2, 2026, City Council Meeting Video Recording, https://denver.granicus.com/player/clip/20013 (last visited Sep. 21, 2026), at 37:36.

[10] *Id.* at 41:20; *see also id.* 38:27 (Councilwoman Lewis commenting that the Ordinance did not support "deportations").

[11] *Id.* at 40:02; *see also id.* at 43:50 (Councilman Flynn commenting that the Ordinance addressed federal immigration policy).

[12] *Id.* at 46:35 (Councilwoman Torres observing that the Ordinance addressed immigration policy "at the local level.").

29. Councilman Cashmann, who supported the Ordinance, expressed skepticism regarding the efficacy of its identification requirement, stating, "I don't care what it says on their shirt or their coat, I'm not opening the door, and certainly not answering the door at my home to someone wearing a mask."[13]

30. On March 3, 2026, Defendant Mayor Michael C. Johnston signed and approved the Ordinance, which was codified as Denver Revised Municipal Code ("D.R.M.C.") § 28-300 *et seq.* (2026).

**THE MASK PROHIBITION AND IDENTIFICATION MANDATE**

31. The Ordinance prohibits "all federal law enforcement officers or agents of a federal law enforcement agency" operating within "the City and County of Denver" from "wear[ing] a facial covering[14] when performing duties that include the interrogation, detainment, arrest, or other activity that restrains the physical movement of an individual." D.R.M.C. §§ 28-301(22); 28-302(a). It also prohibits federal officers and agents "inside any city facility" from "wear[ing] a facial covering to conceal their identity." *Id.* § 28-302(b).

32. The Ordinance further requires that officers and agents "clearly identify themselves by displaying their name, badge or identification number[.]" *Id.* § 28-303(a).

33. The Ordinance specifies that the required identification must be shown (1) "[i]n a size and format that is clearly legible using materials or markings suitable for visibility in both daylight and low-light conditions, under normal operation conditions[,]" *id.* § 28-303(a)(1); (2)

---

[13] *Id.* at 52:17.

[14] The Ordinance defines "[f]acial covering" as any opaque mask, garment, helmet, headgear, or other item that conceals or obscures the facial identity of an individual, including, but not limited to, a balaclava, tactical mask, gator, ski mask, and any similar type of facial covering or face-shielding item." D.R.M.C. § 28-301(1).

"[i]n a manner that is clearly visible and readable during direct engagement with the public[,]" *id.* § 28-303(a)(2); and (3) "[o]n the outermost garment or gear and not obscured by tactical equipment, body armor, or accessories." *Id.* § 28-303(a)(3).

34. If officers and agents do not wear identification in compliance with these conditions, the Ordinance requires them to "provide their name, badge or identification number upon request." *Id.* § 28-303(a)(4).

35. The Ordinance also obligates non-uniformed officers and agents to "visibly display or otherwise provide identification that includes their agency and either a name or badge number or both name and badge number when performing their enforcement duties upon request[.]" *Id.* § 28-303(b). The Ordinance places no limitations on who might make such an identification request.

36. The Ordinance contains limited and ill-defined exceptions for circumstances in which facial coverings are necessary to ensure the physical safety of tactical operations, to meet occupational health and safety requirements, as reasonable accommodations, or for active undercover operations approved by a supervisor or court order. *Id.* §§ 28-302(c); 28-303(c). The Ordinance does not, however, include exceptions for plainclothes operations, surveillance activities, or general safety concerns, such as protection from doxxing or harassment.

37. Because the Ordinance "prohibits or declares to be unlawful the doing of" an act—namely, wearing a facial covering or failing to provide identification—any violation constitutes a criminal offense punishable by up to three hundred days of incarceration and a fine of nine hundred ninety-nine dollars. D.R.M.C. § 1-13(b).

38. Moreover, continuing violations may be punishable as separate offenses. *See id.* § 1-13(c) ("Unless distinct and separate violations can be otherwise established, each day an offense and violation continues shall constitute a separate offense and violation."); § 1-13(g) ("The civil, criminal, and administrative actions, fines, sentences, penalties, judgments, and remedies provided by this Code are intended to be cumulative in nature unless specifically indicated otherwise. The city may pursue one (1) or more of these civil, criminal, and administrative actions, fines, sentences, penalties, judgments, and remedies and may do so simultaneously or in succession.").

**THE ORDINANCE HARMS THE FEDERAL GOVERNMENT AND THE PUBLIC**

39. The United States suffers a sovereign and irreparable injury from the Ordinance. *Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000); *Virginia*, 2026 WL 2411521, at *12 ("It seems rather clear that being subjected to a state law that regulates an activity that is constitutionally delegated to the federal government is an infringement of the Supremacy Clause that constitutes an irreparable injury."); *see also California*, 173 F.4th at 1069 ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental immunity."); *United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) ("The United States has standing to seek relief from actual or threatened interference with the performance of its proper governmental functions."). The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to Denver by complying with its purported requirements for federal law enforcement officers.

40. Even beyond the sovereign injury, compliance with the Ordinance would endanger officers and reduce operational effectiveness by, among other things, subjecting them to doxxing, harassment, and threats to their physical safety.

41. The Ordinance facially requires that federal law enforcement officers and agents of a federal law enforcement agency comply with municipal prohibitions and mandates on facial coverings and identification. The Ordinance subjects officers to criminal penalties for complying with federal laws and policies that govern their official duties and actions.

42. Federal law enforcement officers and agents cannot and will not comply with the Ordinance, which is unconstitutional and recklessly disregards officer safety, public safety, and federal operational needs.

43. Federal law enforcement officers require flexibility in determining when and how to identify themselves during operations. Based on operational needs and safety considerations, agencies such as CBP and ICE give their officers discretion to determine whether to wear facial coverings, whether to add or remove individual identifiers, and what identification is provided to members of the public upon request.[15] This flexibility allows agencies and officers to respond to the specific facts and circumstances of each situation. Imposing Denver's more rigid facial-covering and identification rules would strip federal officers of that necessary operational discretion and undermine both officer safety and operational effectiveness

44. Law enforcement historically has been a dangerous job but now is even more so. Protecting the personal identities of federal officers, and by extension their families, is necessary in part due to the increasing threats of targeted harassment and retaliation against federal officers for simply doing their jobs—enforcing the laws enacted by Congress. While such threats have always existed, the volatile political environment has increased such threats significantly, requiring new tactics to mitigate the harms to officer safety and operational effectiveness.

45. For example, members of the public photograph, film, and publish federal enforcement actions online and include the personal identities of federal officers for the sole

[15] For example, federal regulations provide that "an immigration officer who is authorized to execute an arrest" announce himself and the purpose of the arrest "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii).

purpose of intimidation and harassment. This content can be used by members of organized crime and transnational criminal organizations in serious and potentially deadly ways.

46. Some individuals photograph officers' faces and run them through facial recognition applications that search social media and doxxing sites, such as ICESpy.org. Once a match is made, these individuals search for family members, including children, and disseminate this information online, allowing people to track, harass, and obstruct law enforcement. This opens officers up to harassment, tracking, and assaults in the performance of their duties in the field.

47. Indeed, federal agents and their family members in the Denver area have recently been targeted for doxxing and harassment. Specifically, on January 14, 2026, an ICE deportation officer and his wife were doxxed in the Denver area. The officer's wife's name and photograph were posted on Facebook, Instagram/Threads, and LinkedIn, and a photograph of the family's residence and home address was shared on Instagram/Threads, heightening the family's concerns for its safety. An ICE HSI agent also was identified in a post beneath that photograph.

48. More recently, on September 22, 2026, ICE deportation officers from the Denver, Durango Sub-Office were doxxed when their images were posted on Instagram.

49. Facial coverings can prevent agitators from identifying and tracking officers, especially those using facial recognition or other tools. And while officers almost always wear tags identifying themselves as federal officers (apart from, for example, surveillance, undercover, or plainclothes operations), personal identifiers carry similar risks that can allow agitators to identify and harass individual officers. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal histories or gang affiliations, transnational criminal organizations, and known or suspected terrorists.

50. Facial coverings and removal or modification of personal identifiers also prevent suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, flexibility is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. Websites that enable the widespread dissemination of officers' identities can also undermine undercover operations and plainclothes missions.

51. Finally, the threat of enforcement for noncompliance will only further exacerbate any chilling effects of these laws. Even though federal law enforcement agencies have made clear that they do not intend to comply with the Ordinance, individual officers might be chilled because they face a choice of whether to (a) identify themselves and their agencies when it may be dangerous to themselves, others, and the operation, or (b) face potential citations, court proceedings, and the threat of significant incarceration. Either option presents serious risks and harms and purposefully works to chill the enforcement of federal law.

52. Moreover, enforcement of the Ordinance is impending. The challenged provisions plainly apply to federal law enforcement officers and carry penalties for noncompliance. Many federal officers continue to wear masks and are at imminent risk of prosecution pursuant to the Ordinance. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 110 (10th Cir. 2024) (pre-enforcement standing exists where plaintiff has concrete plans to violate the law and faces a credible threat of prosecution); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–160 (2014) (same). The threat of prosecution is palpable, as Defendant Mayor Michael C. Johnston has

expressed an urgent need to target ICE agents, stating, "the longer they [ICE agents] remain on our streets without immediate reforms the more people are in danger."[16]

53. The Ordinance also harms public safety because chilling the conduct of federal law enforcement officers leaves dangerous individuals at large and compromises operations that protect the broader community, resulting in Denver residents receiving less protection than those in jurisdictions without such restrictions. Additionally, bystanders near enforcement actions face added risk when officers' identities are compelled to be disclosed in real time, as such disclosure disrupts operational functionality. More broadly, the public has an independent interest in the Federal Government's ability to carry out its enforcement functions without Denver's government micromanaging federal officers and agents in the execution of their duties.

54. Notwithstanding that the Ordinance states that "[n]othing in this article shall be interpreted or applied in a manner that violates the U.S. Constitution's Supremacy Clause, Intergovernmental Immunity, or other applicable federal laws," D.R.M.C. § 28-300(a),[17] the challenged provisions of the Ordinance violate the principles of intergovernmental immunity contained within the Supremacy Clause of the United States Constitution by regulating the Federal Government. *See Washington*, 596 U.S. at 838.

[16] *See* https://denverite.com/2026/01/28/denver-mayor-ice-amicus-brief/ (last visited Sep. 29, 2026).

[17] "It is an elementary rule of construction that 'the act cannot be held to destroy itself.'" *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 20 (1995) (quoting *Tx. & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907)).

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE SUPREMACY CLAUSE
### D.R.M.C. § 28-302
### (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

55. Plaintiff hereby incorporates paragraphs 1 through 54 of the Complaint as if fully stated herein.

56. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

57. The Supremacy Clause incorporates principles of intergovernmental immunity, and thus, a local enactment is invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (citation omitted).

58. The Ordinance purports to prohibit federal law enforcement officers or agents of a federal law enforcement agency from wearing a facial covering during the performance of their law enforcement duties in Denver and subjects those officers to criminal liability for noncompliance. *See* D.R.M.C. §§ 1-13(b), 28-302.

59. The Ordinance therefore constitutes unlawful regulation of the Federal Government.

60. Accordingly, the Ordinance is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

**COUNT II**
**VIOLATION OF THE SUPREMACY CLAUSE**
**D.R.M.C. § 28-303**
**(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**

61. Plaintiff hereby incorporates paragraphs 1 through 60 of the Complaint as if fully stated herein.

62. The Ordinance purports to require federal law enforcement officers or agents of a federal law enforcement agency to display or otherwise provide identification while performing their duties in Denver and subjects those officers or agents to criminal penalties for noncompliance. *See* D.R.M.C. §§ 1-13(b), 28-303.

63. The Ordinance therefore constitutes unlawful regulation of the Federal Government.

64. Accordingly, the Ordinance is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court enter a judgment:

A. Declaring that D.R.M.C. §§ 28-302 and 28-303 violate the Supremacy Clause and are therefore invalid as to federal law enforcement officers, agents, or agencies;

B. Declaring that defendants have no authority to enforce D.R.M.C. §§ 28-302 and 28-303 against federal law enforcement officers, agents, or agencies under the doctrine of intergovernmental immunity;

C. Permanently enjoining Defendants, as well as their successors, agents, servants, employees and attorneys, and all those working in concert with them, from enforcing D.R.M.C.

§§ 28-302 and 28-303 and any similar enactments against federal law enforcement officers, agents, or agencies;

D. Awarding the United States its costs and fees in this action; and

E. Awarding any other relief it deems just and proper.

DATED: October 8, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

HILARY K. PERKINS
Director
Enforcement & Affirmative Litigation Branch

JACQUELINE COLEMAN SNEAD
Deputy Director, Affirmative Litigation Section

s/ *Kevin A. Peterson*
***Kevin A. Peterson***
Trial Attorney
Enforcement & Affirmative Litigation Branch
Civil Division, U.S. Department of Justice
450 Fifth Street, N.W., Ste. 6400 South
Washington, D.C. 20001
Telephone: (202) 305-5728
Email: Kevin.A.Peterson@usdoj.gov

*Attorneys for Plaintiff the United States of America*